1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8  MATTHEW WRIGHT,

9                                Plaintiff,          Case No. C18-0927-RAJ-MAT

10        v.

11  STATE OF WASHINGTON, *et al*.,          REPORT AND RECOMMENDATION

12                                Defendants.

13

14  <u>INTRODUCTION AND SUMMARY CONCLUSION</u>

15        This is a civil rights action proceeding under 42 U.S.C. § 1983.  Plaintiff Matthew Wright

16  is currently confined at the Monroe Correctional Complex ("MCC") - Twin Rivers Unit ("TRU").

17  Plaintiff asserts in his amended complaint violations of federal and state law arising out of the

18  alleged infringement of his parental rights.  (Dkt. 34.)  Plaintiff identifies the following five

19  defendants in his amended pleading:  Steven Sinclair, Secretary of the Washington Department of

20  Corrections ("DOC"); Eric Jackson, Superintendent of TRU; Michael Hathaway, Correctional

21  Program Manager at TRU; Diane Carmel, Social Service Specialist II with the Washington

22  Department of Social and Health Services; and, Sarah Wright, plaintiff's ex-wife.  (*Id*. at 3-4.)

23  Plaintiff seeks declaratory and injunctive relief, and damages.  (*Id*. at 14-15.)

REPORT AND RECOMMENDATION
PAGE - 1

Defendants Sinclair, Jackson, and Hathaway ("the DOC defendants") have moved for summary judgment, as have defendants Carmel and Wright by way of separate motions. (Dkts. 51, 69, 83.) Plaintiff has opposed the motions of the DOC defendants and defendant Carmel. (Dkts. 57, 73.) He has not opposed the summary judgment motion filed by defendant Wright. The Court, having reviewed plaintiff's amended complaint, defendants' motions for summary judgment, plaintiff's responses thereto, and the balance of the record, concludes that defendants' motions should be granted, and that plaintiff's amended complaint and this action should be dismissed with prejudice.

## BACKGROUND

Plaintiff entered the Washington DOC in 1994 following his conviction in King County Superior Court on charges of murder in the first degree and rape of a child in the third degree. (Dkt. 53, Ex. 1 at 2-3.) Plaintiff was sentenced to forty-four years in prison and his projected early release date is currently May 4, 2030. (*Id.*) Plaintiff was transferred to MCC in January 2004 where he was assigned to the TRU. (*Id.*, Ex. 1 at 7.)

On June 12, 2010, plaintiff married Sarah Wright (née Jensen). (*Id.*, Ex. 10.) On January 7, 2011, Elizabeth Hainline, the Statewide Visit Specialist for the DOC, received information that an offender at MCC-TRU had a wife who was pregnant and who planned to have the offender listed as the father on the birth certificate, even though the offender was not the biological father of the child, so they could participate in Extended Family Visits ("EFVs") sooner than otherwise would have been permitted. (*See* Dkt. 52, ¶ 6 and Ex. 4.) Ms. Hainline determined that plaintiff was likely the offender in question. (*See id.*) In February 2011, Ms. Wright gave birth to a daughter, L.W., and plaintiff was listed as the father on the birth certificate. (Dkt. 53, Ex. 2.) At the time L.W. was born, plaintiff and Ms. Wright had never had an EFV. (Dkt. 52, ¶ 8.)

REPORT AND RECOMMENDATION
PAGE - 2

In August 2012, the DOC partially approved an EFV application for plaintiff to visit with L.W. and Ms. Wright. (*Id.*, ¶ 7 and Ex. 5.) The Facility Risk Management Team initially recommended that the application be denied because of plaintiff's criminal history, but the Superintendent of the facility and the Deputy Director of Prisons ultimately approved the request on the condition that plaintiff's mother, father, or sister be in attendance during the visits. (*See id.*) Plaintiff and Ms. Wright had two EFVs, one on September 23, 2012 and one on November 11, 2012. (*Id.*, ¶ 8.) However, in January 2013, the DOC terminated the EFVs approved for plaintiff and Ms. Wright after discovering that plaintiff's request should not have been approved because L.W. was not plaintiff's biological child.[1] (*Id.*, ¶ 9.)

In August 2013, plaintiff applied for EFVs with Ms. Wright, L.W., and his step-son, but that application was denied because of plaintiff's criminal history which included domestic violence. (*Id.*, ¶ 10 and Ex. 7.) Plaintiff subsequently applied for EFVs with only L.W. and his step-son and that application was approved on October 3, 2013. (*Id.*, ¶ 11 and Ex. 8.) In May 2014, plaintiff received approval for EFVs with his minor son, J.W., who was born in September 2013. (*Id.*, ¶ 13 and Ex. 10; Dkt. 53, Ex. 3.) The DOC continued to deny EFVs with Ms. Wright based on concerns about plaintiff's criminal history. (*See* Dkt. 52, ¶¶ 10, 12, 14, 15 and Exs. 7, 9, 10, 11, 12, 13.) In March 2016, plaintiff filed for divorce from Ms. Wright in Snohomish County Superior Court. (Dkt. 57-1, ¶ 8.)

On June 15, 2017, TRU Superintendent Eric Jackson received an email from Heather Nelson, Ms. Wright's sister and the aunt of L.W. and J.W., in which Ms. Nelson expressed

---

[1] At the time the application for EFVs was approved, an inmate who married while in DOC custody had to wait three years after the marriage before becoming eligible for EFVs unless the inmate had a child with his spouse. (Dkt. 52, ¶ 9.) When an inmate had a child with his spouse, the inmate became eligible for EFVs after only one year. (*Id.*)

REPORT AND RECOMMENDATION
PAGE - 3

concerns that plaintiff was taking naked baths with his children during their EFVs, including with his six-year old daughter.  (*See* Dkt. 54, Ex. 1.)  The email was forwarded to Correctional Program Manager Michael Hathaway for further action.  (*See id*., ¶ 2 and Ex. 1.)  On June 16, 2017, Mr. Hathaway called Ms. Nelson and spoke to her about the concerns expressed in her email.  (*Id*., ¶ 3 and Ex. 1.)  Ms. Nelson explained that she had learned about this behavior from Ms. Wright, and that Ms. Wright had asked the children about possible inappropriate touching and concluded that it had not happened.  (*Id*., Ex. 1.)  Ms. Nelson also expressed concern that the children's escort, plaintiff's sister Theodora Wright, slept on the sofa while the children slept with plaintiff in the same bed with the door closed.  (*Id*.)

Based on his conversation with Ms. Nelson, Mr. Hathaway contacted the Washington Department of Social and Health Services ("DSHS") because he had concerns about the safety of the children and because he understood that he was a mandatory reporter when it came to allegations of child abuse.  (*Id*., ¶ 4.)  Mr. Hathaway also contacted Kristi Webb who coordinates EFVs for MCC and had her suspend an EFV that was scheduled for June 18, 2017 so that the matter could be investigated further.  (*Id*., ¶ 5.)  Though plaintiff's EFVs were suspended, he continued to have regular contact visits with his children.  (Dkt. 52, ¶ 16.)

On June 19, 2017, the Monroe Police Department opened a criminal investigation, apparently based on Mr. Hathaway's report to DSHS.  (*See* Dkt. 54, ¶ 5 and Ex. 3.)  As a part of this investigation, Monroe Detective Barry Hatch contacted Ms. Nelson.  (*Id*., Ex. 3 at 11.)  Ms. Nelson told Detective Hatch about a poem book that plaintiff had created for his son and that Ms. Wright had shared with family members via Facebook.  (*Id*.)  Detective Hatch was told the content was "disturbing."  (*Id*.)

In July 2017, Detective Hatch received a call from Kathryn Peterson, an attorney

REPORT AND RECOMMENDATION
PAGE - 4

representing plaintiff in both his dissolution case and in third-party child custody cases. (*See id.* and Dkt. 73-6, ¶ 3.) Ms. Peterson suggested to Detective Hatch that Ms. Wright had falsely reported the crime he was investigating, and that DOC telephone recordings would prove that Ms. Wright had pre-planned these allegations. (Dkt. 54, Ex. 3 at 11.) Ms. Peterson urged Detective Hatch to examine the matter for false reporting, but Detective Hatch declined to open a separate false reporting case because Ms. Wright was not the reporting party. (*Id.*)

On August 21, 2017, L.W. was interviewed by a child interview specialist. (*Id.*, Ex. 3 at 14-15.) During the interview, L.W. indicated that plaintiff had taken baths with her and her younger brother and that "lately" plaintiff had been keeping his underwear on while bathing with them. (*Id.*, Ex. 3 at 14.) L.W. also described an incident where plaintiff pulled his pants and underwear down and jostled his body back and forth while saying "Hey look it's super big, right[?]" (*Id.*)

In September 2017, the DSHS investigation initiated based on MR. Hathaway's report regarding the allegations of plaintiff bathing naked with his children was closed because law enforcement had become involved in the investigation. (Dkt. 73-2, Ex. A at 4.) In October 2017, Diane Carmel, a Social Service Specialist employed with the DSHS Children's Administration, was assigned a new case involving the Wright children, a so-called Family Assistance Response ("FAR"). (Dkt. 69-1, ¶ 4.) This new case was based on concerns of neglect in the home where Ms. Wright resided with L.W and J.W. (*Id.*) Ms. Carmel was not involved with the Wright family prior to being assigned the FAR case in October 2017. (*Id.*)

After being assigned the case pertaining to Ms. Wright, Ms. Carmel spoke with her supervisor about the Wright family history and the prior report regarding overnight visitation at the correctional facility. (*Id.*, ¶ 5.) According to Ms. Carmel, they had serious concerns regarding

REPORT AND RECOMMENDATION
PAGE - 5

the safety of the children during the overnight visitation, and about the hostile relationship plaintiff and his sister, Theodora Wright, had with Sarah Wright. (*See id.*) Though Ms. Carmel never met Ms. Wright, she did speak with Ms. Wright on the telephone during the FAR case while Ms. Wright was in a treatment facility in California. (*See id.*; Dkt. 69-3, ¶ 2.)

During the FAR case, Ms. Carmel also spoke with David Hodges who was appointed as guardian ad litem ("GAL") for L.W. and J.W. in the Wrights' dissolution case. (*See* Dkt. 69-2, ¶ 2; Dkt. 73-3, Ex. D at 3.) While conducting his investigation in the dissolution case, Mr. Hodges consulted with Lisa Dandescue, the Sexual Offender Treatment Program ("SOTP") manager for the DOC's Sex Offender Treatment and Assessment Program ("SOTAP") at TRU, regarding overnight visits involving sex offenders. (Dkt. 69-1, Ex. 3; Dkt. 69-2, ¶ 2 and Ex. 1.) Ms. Dandescue opined that it was "extremely unusual" for a prisoner such as plaintiff who was convicted of a sex offense to be authorized overnight visits at the prison with minors, and Mr. Hodges conveyed that opinion to Ms. Carmel. (Dkt. 69-1, ¶ 6 and Ex. 3.)

On November 30, 2017, Ms. Carmel sent a letter to Mr. Hathaway in which she detailed concerns regarding plaintiff's conduct with his children during the overnight visits at MCC and requested, on behalf of the Department of Children's Administration, that overnight visits not be reinstated and that visits between plaintiff and his children "always occur in an open space with Law Enforcement officials observing at all times."[2] (Dkt. 54, ¶ 6 and Ex. 2.) After reviewing the

---

[2] On December 26, 2017, Ms. Carmel apparently sent a second, similar, letter to MR. Hathaway reiterating her concerns regarding the overnight visits and her requests regarding restrictions on plaintiff's visitation with his children. (Dkt. 69-1, ¶ 7 and Ex. 1.) Plaintiff's counsel has submitted multiple copies of Ms. Carmel's letter that he received while investigating plaintiff's claims which bear a variety of different dates and, in some cases, not date at all. (*See* Dkt. 73-2, ¶¶ 2, 18 and Ex. Q.) It is not clear from the record how many of the letters were actually sent. The letters appear to be essentially the same save for the fact that some, like the letter sent to MR. Hathaway on November 30, 2017, recommended that the visits between plaintiff and his children occur with law enforcement "observing" at all times while others, such as the one dated December 26, 2017, recommended that the visits occur with law enforcement "supervising" at all times. (*See* Dkt. 54, Ex. 2; Dkt. 69-1, Ex. 1.) While this distinction is not

letter and consulting with Superintendent Jackson, a decision was made to suspend all of plaintiff's contact visits with minor children until further notice. (*Id.*, ¶ 7.) On December 4, 2017, letters were sent to all individuals identified as escorts for the minors on plaintiff's visitors list notifying them of the suspension. (*Id.*) Plaintiff was apparently notified of the suspension at around the same time. (*See* Dkt. 68, ¶ 40.)

In February 2018, Monroe Police Detective Hatch referred the case he had been investigating to the Snohomish County Prosecutor's Office for a charging decision with respect to the crime of communicating with a minor for immoral purposes. (Dkt. 54, ¶ 8 and Ex. 3 at 17.) On February 23, 2018, the Prosecutor's Office issued a notice declining to file charges because there was insufficient evidence to prove the crime. (*Id.*, ¶ 8 and Ex. 4.) Mr. Hathaway thereafter worked to obtain records from the Monroe Police Department so that he could conduct an internal DOC investigation related to the matters which were the subject of the original complaint by Heather Nelson. (*Id.*, ¶ 8.)

Mr. Hathaway began his internal investigation in April 2018. (*Id.*, ¶ 9.) He interviewed plaintiff on April 11, 2018 and May 1, 2018 and notified plaintiff during those interviews of the allegations that were being investigated. (*See id.*, ¶ 11.) Plaintiff attributed the allegations to harassment by his ex-wife. (*Id.*, Ex. 5.) Plaintiff admitted taking baths with his children but denied doing so while naked and denied showing his penis to his children. (*Id.*)

On May 1, 2018, as a part of his investigation, Mr. Hathaway emailed Ms. Carmel seeking clarification of a part of her November 2017 letter regarding visitation. (*See id.*, ¶¶ 10, 12 and Ex.

---

relevant to resolution of the pending summary judgment motions, the Court makes note of it because some of the arguments made by plaintiff in his response to Ms. Carmel's summary judgment motion revolve around this distinction. (*See* Dkt. 73 at 7-9, 13, 21.)

REPORT AND RECOMMENDATION
PAGE - 7

6.)  Specifically, Mr. Hathaway asked if the request that visitation occur in "open space with Law Enforcement officials observing at all times" meant that the children should be supervised by corrections staff or by an impartial observer.  (*See id.*)  Mr. Hathaway explained that there was no way corrections staff could supervise such visits given the DOC's custody model and available resources.  (*Id.*)  He further explained that the DOC would need assistance to make the recommended supervised visitation work.  (*Id.*)

Ms. Carmel, in response, advised that the recommendation of her department was that visits needed to be supervised by an impartial third party and she suggested that the family could perhaps retain a visitation supervisor from another agency.  (*See id.*)  Ms. Carmel explained that the supervising individual needed to be able to hear what was being said and to see any physical contact made by the parties involved.  (*Id.*)  She concluded by stating that plaintiff's "actions and conversations lead us to believe that your current visitation and supervision is not adequate and would not be a safe environment for his children."  (*Id.*, Ex. 6.)

On June 11, 2018, Mr. Hathaway completed his investigation and sent an investigation report to Superintendent Jackson.  (*Id.*, ¶ 13 and Ex. 7.)  Mr. Hathaway recommended that plaintiff be allowed to resume regular visitation with his children with a professional escort at all times.  (*Id.*)  He also recommended that plaintiff's EFVs with his children be suspended permanently.  (*Id.*)  Superintendent Jackson adopted these recommendations and notified plaintiff of his decision on June 13, 2018.  (Dkt. 52, Ex. 14.)

Plaintiff filed the instant action on June 25, 2018.  (*See* Dkt. 1.)  Plaintiff subsequently filed an amended complaint which is the operative pleading in this action.  (Dkt. 34.)  Plaintiff identifies the following five claims in his amended complaint: (1) Deliberate Indifference; (2) Denial of Due Process; (3) Equal Protection; (4) Conspiracy to Violate Fourteenth Amendment; and, (5) Tortious

REPORT AND RECOMMENDATION
PAGE - 8

1    Interference with Parent Child Relationship.  (*Id.*)

2                                    DISCUSSION

3                            Summary Judgment Standard

4            Summary judgment is appropriate when a "movant shows that there is no genuine dispute

5    as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

6    56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails

7    to make a sufficient showing on an essential element of his case with respect to which he has the

8    burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears

9    the initial burden of showing the district court "that there is an absence of evidence to support the

10   nonmoving party's case."  *Id.* at 325.  The moving party can carry its initial burden by producing

11   affirmative evidence that negates an essential element of the nonmovant's case, or by establishing

12   that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at

13   trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

14   The burden then shifts to the nonmoving party to establish a genuine issue of material fact.

15   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must

16   draw all reasonable inferences in favor of the nonmoving party.  *Id.* at 585-87.

17          In supporting a factual position, a party must "cit[e] to particular parts of materials in the

18   record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine

19   dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R.

20   Civ. P. 56(c)(1).  The nonmoving party "must do more than simply show that there is some

21   metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 585.  "[T]he

22   requirement is that there be no *genuine* issue of material fact. . . .  Only disputes over facts that

23   might affect the outcome of the suit under the governing law will properly preclude the entry of

REPORT AND RECOMMENDATION
PAGE - 9

summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

Section 1983 Standard

In order to set forth a *prima facie* case under § 1983, a plaintiff must establish a deprivation of a federally protected right. *Baker v. McCollan*, 443 U.S. 137, 140 (1979). The particular harm complained of must be scrutinized in light of specifically enumerated rights. *Id.* That a plaintiff may have suffered harm, even if due to another's negligent conduct, does not itself demonstrate a violation of constitutional protections. *See*, *e.g.*, *Davidson v. Cannon*, 474 U.S. 344, 347 (1986) ("[W]here a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required.").

A plaintiff must also allege facts in his § 1983 complaint showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981). To satisfy the causation requirement, a plaintiff must demonstrate that a defendant did an affirmative act, participated in another's affirmative act, or

REPORT AND RECOMMENDATION
PAGE - 10

omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold*, 637 F.2d at 1355 (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). A defendant cannot be held liable under § 1983 solely on the basis of the individual's supervisory responsibility or position. *Monell v. Department of Social Servs., of City of New York*, 436 U.S. 658, 691-694 (1978). Rather, a plaintiff must allege that a defendant's own conduct violated the plaintiff's civil rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385-90 (1989).

## Defendant Stephen Sinclair

The DOC defendants argue in their motion for summary judgment that Secretary Sinclair should be dismissed from this action because there is no evidence that he had any involvement in decisions relating to plaintiff's visitation. (Dkt. 51 at 8.) Plaintiff concedes in his response to the DOC defendants' summary judgment motion that he has insufficient evidence of Secretary Sinclair's personal participation in the denial of his rights under 42 U.S.C. § 1983. (Dkt. 57 at 8.) Given this concession, it is appropriate to dismiss Secretary Sinclair from this action.

## Eighth Amendment: Deliberate Indifference/Failure to Protect

Plaintiff asserts in his amended complaint that he was threatened on numerous occasions by his ex-wife and other inmates with physical harm and with removal of his children if "he did not succumb to their extortionate requests for money." (*See* Dkt. 34, ¶ 54.) Plaintiff complains that defendants did nothing to stop the threats or to protect him despite being specifically informed of the threats. (*Id.*) Plaintiff alleges that as a result of defendants' deliberate indifference to his parental rights, he suffered emotional distress, missed time with his children, and incurred expenses related to phone usage and legal representation. (*Id.*, ¶ 55.)

The DOC defendants argue in their summary judgment motion that plaintiff's Eighth Amendment claims should be dismissed because plaintiff failed to exhaust his administrative

REPORT AND RECOMMENDATION
PAGE - 11

1    remedies with respect to those claims.[3]  (Dkt. 51 at 9-10.)  Though plaintiff has made various

2    assertions and arguments regarding exhaustion during the pendency of this case, his current

3    position appears to be that the grievance process was effectively unavailable to him and that his

4    failure to exhaust should therefore be excused.  (*See* Dkt. 70.)

5        Section 1997e(a) provides that "[n]o action shall be brought with respect to prison

6    conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any

7    jail, prison, or other correctional facility until such administrative remedies as are available are

8    exhausted."  Section 1997e(a) requires *complete* exhaustion through any available process.  *See*

9    *Porter v. Nussle* 534 U.S. 516, 524 (2002); *Booth v. Churner*, 532 U.S. 731, 735 (2001).  Section

10    1997e(a) also requires *proper* exhaustion.  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  "Proper"

11    exhaustion means full compliance by a prisoner with all procedural requirements of an institution's

12    grievance process.  *See id.* at 93-95.  Finally, §1997e(a) requires exhaustion before a complaint is

13    filed, and exhaustion of remedies during the course of the litigation does not constitute compliance

14    with this requirement.  *See McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002) (per curiam).

15    If administrative remedies have not been exhausted at the time an action is brought, the action

16    must be dismissed without prejudice.  *Id*.

17        Failure to exhaust administrative remedies is an affirmative defense which a defendant

18    must plead and prove.  *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (citing *Jones v. Bock*,

19    549 U.S. 199, 216 (2007)).  A defendant must produce evidence demonstrating that there was an

20

21        [3] Defendants argue in the alternative that plaintiff has not established a viable Eighth Amendment claim and
      that they are entitled to qualified immunity.  (Dkt. 51 at 10-13.)  Ms. Wright, in her motion for summary judgment,
22    argues as well that plaintiff has not stated a viable deliberate indifference claim against her.  (Dkt. 83 at 3-4.)  The
      Court deems the exhaustion issue dispositive and therefore need not address the substance of plaintiff's Eighth
23    Amendment claims.

REPORT AND RECOMMENDATION
PAGE - 12

available administrative remedy and that the prisoner did not exhaust that remedy.  *Id*. at 1172.
The burden then shifts to the prisoner who must show that there is something in his case that made
the existing remedies effectively unavailable to him.  *Id*.   If undisputed evidence viewed in the
light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary
judgment.  *Id*. at 1166.

The Ninth Circuit has recognized that acts by prison officials that prevent the exhaustion
of administrative remedies may make administrative remedies effectively unavailable to a
prisoner.  *See Nunez v. Duncan*, 591 F.3d 1217, 1224-25 (9th Cir. 2010).  Similarly, in *Ross v.
Blake*, 136 S. Ct. 1850, 1859 (2016), the United States Supreme Court held that § 1997e(a) requires
an inmate to exhaust only those grievance procedures "that are capable of use to obtain some relief
for the action complained of."  *Id*. (citation and internal quotation marks omitted).  The Supreme
Court went on to note three circumstances in which an administrative remedy, although officially
available, is not capable of use to obtain relief:  (1) when the administrative procedure "operates
as a simple dead end—with officers unable or consistently unwilling to provide any relief to
aggrieved inmates"; (2) when the administrative scheme is "so opaque that it becomes practically
speaking, incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) when
prison administrators "thwart inmates from taking advantage of a grievance process through
machination, misrepresentation, or intimidation."  *Ross*, 136 S. Ct. at 1859-60.

The DOC defendants submitted in support of their motion for summary judgment the
declaration of Dale Caldwell, Grievance Program Manager for the DOC.  (Dkt. 55.)   The
declaration includes information regarding the various levels of review available under the DOC's
Offender Grievance Program ("OGP"), and it also includes a copy of the OGP Manual which
details, among other things, the issues that are grievable under the program.  (*Id*., ¶ 4; Dkt. 55-1.)

REPORT AND RECOMMENDATION
PAGE - 13

The manual specifically identifies "actions of employees," "actions of other offenders," and "personal safety" as issues that are grievable. (*See* Dkt. 55-1 at 10.) Mr. Caldwell states in his declaration that since January 1, 2016, plaintiff has filed only three grievances which he pursued through the entire grievance process. (Dkt. 55, ¶ 6.) One of those grievances dealt with medical issues and the other two dealt with complaints regarding the visit staff. (*See id*., ¶¶ 7-9; Dkt. 55-1 at 38-46.) None of the grievances related in any way to plaintiff's Eighth Amendment deliberate indifference/failure to protect claims. (*Id*.)

Plaintiff argued in his original response to the DOC defendants' summary judgment motion that his Eighth Amendment claims should not be dismissed for failure to exhaust because defendants had not demonstrated that he had available remedies under the grievance procedure, or that he had not filed a grievance.[4] (Dkt. 57 at 8.) In fact, defendants' motion papers clearly demonstrated both of those things. In his supplemental brief addressing the exhaustion issue, plaintiff claims that he failed to file grievances detailing purported threats of physical harm made by other inmates in the "spring of 2018" because he was "intimidated" by the DOC investigative staff. (*See* Dkt. 70 at 1-2; Dkt. 71, ¶¶ 2, 3.)

The Court first notes, with respect to plaintiff's most recent argument, that plaintiff does not assert in his amended complaint any facts pertaining to threats of harm in the spring of 2018. (*See* Dkt. 34.) Likewise, plaintiff make no reference to any specific threats received during that period of time in his original brief in opposition to the DOC defendants' summary judgment motion or his accompanying declaration. (*See* Dkts. 57, 57-1.) Plaintiff indicates only that he sent

---

[4] Plaintiff also argued that defendants waived any exhaustion defense because they failed to plead the defense in their answer. (Dkt. 57 at 8-9.) The Court subsequently granted defendants leave to amend their answer to add the affirmative defense of failure to exhaust administrative remedies. (Dkt. 67.) That ruling renders plaintiff's waiver argument moot.

REPORT AND RECOMMENDATION
PAGE - 14

emails to defendants Hathaway and Jackson during that time complaining about threats from his ex-wife and their failure to investigate those threats. (*See* Dkt. 57-1, ¶¶ 44, 45, 46.) The latest of the threats specifically identified by plaintiff in his materials was a threatening email plaintiff claims he received from former inmate James Burch in February 2017. (*See* Dkt. 57-1, ¶ 23; Dkt. 71, ¶ 6.) Plaintiff concedes in a declaration submitted in support of his supplemental brief regarding exhaustion that he did not file his first grievance relating to this lawsuit until May 2018 (Dkt. 71, ¶ 2), well past the deadline for filing a grievance under the OGP relating to events that occurred in early 2017.[5]

Assuming plaintiff has adequately alleged a deliberate indifference/failure to protect claim arising out of threats of harm in the spring of 2018, the Court turns to plaintiff's argument that he was intimidated by the prison investigative staff from properly exhausting claims related to those threats. In his declaration in support of his supplemental brief, plaintiff states that he filed his May 2018 grievance after defendant Hathaway advised him he was not going to reinstate plaintiff's EFVs and parental visits with his children. (*Id.*) Plaintiff indicates he briefly, and in vague terms, stated in his grievance that he had been harassed and threatened.[6] (*Id.*) Plaintiff claims he did not provide more specific details regarding the threats and harassment because of communications he had had with DOC Investigator Bob Howard. (*See* Dkt. 70 at 2; Dkt. 71, ¶¶ 2.)

According to plaintiff, Mr. Howard, who was investigating a violent prison gang based on information apparently provided by plaintiff (*see* Dkt. 57-1, ¶ 6), told plaintiff he "should not file any paperwork, send any kiosk messages, file any grievances, or send any emails *relating to my*

---

[5] Pursuant to the OGP, offender complaints must be submitted within 20 working days of the date of the challenged incident. (*See* Dkt. 55-1 at 21.)

[6] Plaintiff has not provided a copy of this grievance for the Court to review so the Court has no way to confirm or evaluate the precise contents of that grievance.

REPORT AND RECOMMENDATION
PAGE - 15

*meetings with the Assistant Attorney General, the Kiwanis International Attorneys, and Monroe Correctional Complex Investigators*" because Mr. Howard could not keep him safe if anyone found out about the information plaintiff was providing to these officials. (*Id.*, ¶ 3 (emphasis added).)

The Ninth Circuit has recognized that "the threat of retaliation for reporting an incident can render the prison grievance process effectively unavailable and thereby excuse a prisoner's failure to exhaust administrative remedies." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015). The test for determining whether the failure to exhaust is excusable requires a prisoner to show that the threat of retaliation actually did deter him from filing or pursuing a grievance, and that the threat is one which would deter a reasonable prisoner of ordinary firmness from filing or pursuing a grievance. *Id.*

In this case, plaintiff makes no claim that any prison official threatened retaliation. He suggests instead that threats by other inmates should excuse his failure to exhaust. Plaintiff cites no authority to support the proposition that threats by fellow inmates may excuse a failure to exhaust. To the extent plaintiff attributes his purported reticence to file grievances pertaining to the threats from other inmates to the actions of Mr. Howard, he states only that Mr. Howard advised him against filing grievances or other paperwork relating to his meetings with the Assistant Attorney General, MCC investigators, and others involved in the investigation of the prison gang plaintiff was assisting in. Assuming Mr. Howard did provide such advice, nothing in Mr. Howard's purported statement says anything about grievances related to threats by other inmates or the corrections staff's failure to protect him from the alleged threats.

The Court is not persuaded that "a reasonable prisoner of ordinary firmness" would have been deterred from filing a grievance under the circumstances alleged by plaintiff. It is particularly

REPORT AND RECOMMENDATION
PAGE - 16

noteworthy that while plaintiff claims he feared for his safety if he were to file grievances notifying prison staff of the threats from other inmates, he also claims that he repeatedly alerted corrections staff to the threats he was receiving and to concerns about his safety.  Plaintiff's suggestion that he was reluctant to file a grievance reporting these threats is highly inconsistent with his other admitted behavior.

Plaintiff clearly failed to exhaust his administrative remedies with respect to his Eighth Amendment claims and he fails to demonstrate that his failure to exhaust should be excused. Defendants are therefore entitled to summary judgment with respect to plaintiff's deliberate indifference/failure to protect claims.

<u>Fourteenth Amendment:  Due Process</u>

Plaintiff asserts that defendants violated his right to procedural due process when they suspended and revoked his visitation rights and thereby caused him to lose the ability to parent and interact with his children.  (Dkt. 34 at 10-11.)  Plaintiff claims that he was entitled to due process before these rights could be taken away.  All defendants move for summary judgment with respect to this claim.  (Dkt. 51 at 13-16; Dkt. 69 at 5-7; Dkt. 83 at 4-5.)  Plaintiff does not oppose Ms. Wright's request for summary judgment on his due process claim, but he does oppose the DOC defendants' request for summary judgment and defendant Carmel's request for summary judgment on this claim.

The DOC defendants argue in their motion for summary judgment that plaintiff does not have a protected liberty interest in either regular visits with his children or in extended family visits; *i.e.*, overnight visits, and, thus, plaintiff cannot show a viable due process claim.  (Dkt. 51 at 13-15.)  Defendant Carmel, in her motion for summary judgment, adopts the arguments of the DOC defendants, arguing that plaintiff does not have a liberty interest in unsupervised or overnight

REPORT AND RECOMMENDATION
PAGE - 17

visits.  (Dkt. 69 at 5-6.)  Defendant Wright argues in her summary judgment motion that she is not the "state" and it is outside her purview to dictate what, if any, visitations should be permitted at MCC.  (Dkt. 83 at 4-5.)

The Fourteenth Amendment protects against governmental deprivations of "life, liberty, or property" without due process of law.  U.S. Const. amend. XIV § 1.  The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only when a constitutionally protected liberty or property interest is at stake.  *Ingraham v. Wright*, 430 U.S. 651, 672 (1977).  Liberty interests protected by the Fourteenth Amendment may arise from either the Due Process Clause itself or from state law.  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Liberty interests created under state law are generally limited to freedom from restraint which imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."  *Sandin v. Conner* 515 U.S. 472, 483-84 (1995).

It is well established that prisoners have no due process right while incarcerated to either contact or conjugal visits.  *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460-61 (1989) (holding that "[t]he denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence, and therefore is not independently protected by the Due Process Clause"); *Block v. Rutherford*, 468 U.S. 576, 589 (1984) (holding that "the Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility"); *Dunn v. Castro*, 621 F.3d 1196, 1202 (9th Cir. 2010) (finding no clearly established right to visitation); *Bazzetta v, McGinnis*, 430 F.3d 795, 804-05 (6th Cir. 2005) (finding no circuit court case that recognized an implicit due process right to prison visitation); *Wirsching v. Colorado*, 360 F.3d 1191, 1200-02 (10th Cir. 2004) (upholding

REPORT AND RECOMMENDATION
PAGE - 18

prohibition on sex offender's visits with his own children so long as he refused to participate in treatment); *Hernandez v. Coughlin*, 18 F.3d 133 (2d Cir. 1994) (finding no protected liberty interest in conjugal visits); *Toussaint v, McCarthy*, 801 F.2d 1080, 1113-14 (9th Cir. 1986) (abrogated in part on other grounds by *Sandin*, 515 U.S. at 483-84) (noting that denial of contact visits "is part of the penalty that criminals pay for their offenses against society").

The applicable case law leaves little doubt that plaintiff has no protected liberty interest in regular visits with his children. Plaintiff, in apparent recognition of the fact that the weight of authority is against him, argues that he is not claiming an entitlement to a specific type of visitation with his children, but is instead asserting that he has a liberty interest in being able to see and parent his children. (*See* Dkt. 57 at 13; Dkt. 73 at 12.) Plaintiff asserts as well that having been allowed to see and bond with his children regularly during the course of his incarceration, the state must afford him due process before it can take his children from him. (*Id*.) Plaintiff, in support of this argument, relies on United States Supreme Court case law which recognizes that parents have a fundamental liberty interest in making decisions regarding the care, custody, and control of their children. (*See* Dkt. 57 at 12, 14; Dkt. 73 at 11; *Troxel v. Granville*, 530 U.S. 57, 65-6 (2000).)

The Court first notes that nothing in the record suggests that plaintiff was deprived of all opportunities to communicate or interact with his children. Plaintiff was merely precluded from having further overnight visits with his children and he was temporarily prevented from having regular contact visits with his children. Moreover, plaintiff cites no authority to support the proposition that the right to parent a child guarantees inmates contact visitation with their children. In fact, the weight of authority is to the contrary. As the Supreme Court has repeatedly made clear, "[l]awful incarceration brings about the necessary withdrawal or limitation of many rights and privileges." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (internal quotation marks omitted). In

REPORT AND RECOMMENDATION
PAGE - 19

*Overton v. Bazzetta*, 539 U.S. 126, 131 (2003), the Supreme Court observed that "freedom of association is among the rights least compatible with incarceration" and that "[s]ome curtailment of that freedom must be expected in the prison context." And, as noted above, the Supreme Court and a multitude of federal appellate courts have consistently concluded that the right to receive visits while incarcerated, including visits from family members, is one such right which is necessarily limited by the fact of incarceration. *See Thompson*, 490 U.S. at 461; *Rutherford*, 468 U.S. at 589; *Dunn*, 621 F.3d at 1203 n.4 (listing cases).

Because plaintiff has no liberty interest in visitation with his children, his procedural due process claim necessarily fails. All defendants are therefore entitled to summary judgment with respect to that claim.

Fourteenth Amendment:  Equal Protection

Plaintiff also asserts in his amended complaint that defendants have deprived him of his right to equal protection by preventing him from seeing his children. (Dkt. 34 at 11.) Plaintiff claims that no other inmates have been deprived of their right to visit with their children without a court order and without a viable explanation for these deprivations. (*Id*. at 11-12.) All defendants move for summary judgment with respect to this claim. (Dkt. 51 at 19-22; Dkt. 69 at 9-10; Dkt. 83 at 5.) Plaintiff does not oppose the DOC defendants' request for summary judgment or Ms. Wright's request for summary judgment on his equal protection claim, but he does oppose defendant Carmel's request for summary judgment on this claim.

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The Equal Protection Clause essentially mandates that state and local governments treat alike all persons who are similarly situated. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432,

REPORT AND RECOMMENDATION
PAGE - 20

439 (1985).  As a general matter, in order to state an equal protection claim under § 1983, a plaintiff

must show that the defendant acted with an intent or purpose to discriminate against the plaintiff

based upon membership in a protected class.  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir.

1998).  However, "[w]hen an equal protection claim is premised on unique treatment rather than

on a classification, the Supreme Court has described it as a 'class of one' claim."  *North Pacifica*

*LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (citing *Village of Willowbrook v. Olech*,

528 U.S. 562, 564 (2000) (per curiam)).  Plaintiff indicates that this is the type of equal protection

claim he intends to assert.  (Dkt. 73 at 19.)

In order to claim a violation of equal protection in a class-of-one case, a plaintiff must show

that the defendant intentionally treated him differently from other similarly situated persons

without a rational basis.  *Id.*  A class-of-one plaintiff must also show that the difference in treatment

resulted from non-discretionary state action.  *Engquist v. Oregon Dep't of Agriculture*, 553 U.S.

591, 603 (2008).  The Supreme Court, in *Engquist*, explained as follows:

> There are some forms of state action, however, which by their nature involve
> discretionary decisionmaking based on a vast array of subjective, individualized
> assessments. In such cases the rule that people should be "treated alike, under like
> circumstances and conditions" is not violated when one person is treated differently
> from others, because treating like individuals differently is an accepted
> consequence of the discretion granted. In such situations, allowing a challenge
> based on the arbitrary singling out of a particular person would undermine the very
> discretion that such state officials are entrusted to exercise.

*Id.*

Decisions regarding whether any particular inmate is suitable to retain visitation privileges

with his children or others, and the conditions under which any authorized visitation will be

permitted to occur, necessarily involve a case-by-case determination, discretionary decision-

making, and subjective, individualized assessments.  Allowing the type of equal protection

REPORT AND RECOMMENDATION
PAGE - 21

challenge asserted here against the DOC defendants and defendant Carmel would undermine the very discretion that these state officials are entrusted to exercise. *See id.* Even assuming plaintiff's class-of-one claim were viable in the context presented here, plaintiff has not explained to *whom* he was similarly situated. For these reasons, plaintiff's equal protection claim fails. Defendants are therefore entitled to summary judgment with respect to that claim.

<u>Fourteenth Amendment:  Conspiracy</u>

Plaintiff alleges in his fourth claim for relief that defendants Carmel, Jackson, Hathaway and Wright engaged in a conspiracy under § 1983 to prevent him from exercising his parental visitation rights by suspending his visitation and thereby preventing him from spending time with his minor children. (Dkt 34 at 12.) All defendants move for summary judgment with respect to this claim. (*See* Dkt. 51 at 22; Dkt. 69 at 10-11; Dkt. 83 at 5.) Plaintiff does not oppose the DOC defendants' request for summary judgment or Ms. Wright's request for summary judgment on his conspiracy claim, but he does oppose defendant Carmel's request for summary judgment on this claim.

In order to establish liability for a conspiracy in an action brought under § 1983, a plaintiff must "demonstrate the existence of an agreement or meeting of the minds" to violate constitutional rights. *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1301 (9th Cir.1999)). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.* "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.* (quoting *United Steelworkers of American v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989).)

REPORT AND RECOMMENDATION
PAGE - 22

1    Conspiracy is not itself a constitutional tort under § 1983, and a conspiracy claim does not

2    enlarge the nature of a plaintiff's claims. *Lacey v. Maricopa County* 693 F.3d 896, 935 (9th Cir.

3    2012). Rather, there must always be proof of an underlying constitutional violation in order to

4    support a conspiracy claim. As this Court has concluded that plaintiff has not established any

5    violation of his federal constitutional rights, his conspiracy claim necessary fails. Defendants are

6    therefore entitled to summary judgment with respect to that claim.

7                                   Pendent State Law Claim

8    In addition to the federal constitutional claims asserted by plaintiff in his amended

9    complaint, plaintiff also asserts a single state law claim against Ms. Wright for tortious interference

10   with the parent child relationship. The Supreme Court has stated that federal courts should refrain

11   from exercising their pendent jurisdiction when the federal claims are dismissed before trial.

12   *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Because plaintiff's federal

13   constitutional claims are subject to dismissal based upon plaintiff's failure to establish any

14   violation of his federal constitutional rights, this Court should decline to exercise jurisdiction over

15   plaintiff's state law claim.

16                                Defendants' Motions to Strike

17   The DOC defendants and defendant Carmel in their respective replies to plaintiff's

18   responses to their summary judgment motions, move to strike various statements contained in the

19   declarations submitted by plaintiff in support of those responses on the grounds that the statements

20   constituted hearsay or were conclusory and/or speculative in nature. (*See* Dkt. 60 at 2-5; Dkt. 75

21   at 1-4; Dkt. 72 at 2.) Given the general deficiencies in plaintiff's claims, the many declarations

22   submitted by plaintiff in this action were largely irrelevant and unnecessary to the ultimate

23   disposition of plaintiff's claims. In fact, the Court referenced plaintiff's declarations only in the

REPORT AND RECOMMENDATION
PAGE - 23

context of his Eighth Amendment claim and did not rely on any inadmissible evidence for substantive purposes. The Court therefore declines to undertake the labor-intensive task of identifying and striking all objectionable content.

Requests for Finding of Frivolousness/Maliciousness

Defendants, in their respective summary judgment motions, ask the Court to make a finding that the instant action is frivolous and/or malicious. (*See* Dkt. 51 at 23-24; Dkt 69 at 11-12; Dkt. 83 at 6.) The DOC defendants and defendant Carmel seek a frivolous or malicious finding that would count against plaintiff under 28 U.S.C. § 1915(g).[7] Defendant Wright seeks such a finding so that she will be entitled to seek attorney's fees and costs for having to defendant this lawsuit.

The Ninth Circuit has defined a "frivolous" case as one "of little weight or importance: having no basis in law or fact." *Andrews v. King*, 398 F.3d 1113, 1121 (9th Cir. 2005) (citations omitted). A separate standard for maliciousness is not well established but includes an action that "is plainly abusive of the judicial process or merely repeats pending or previously litigated claims." *Abdul-Akbar v. Department of Corrections*, 910 F. Supp. 986, 999 (D. Del. 1995). The Court has no difficulty concluding that the instant action is frivolous given that the claims asserted have no apparent basis in law or fact. While the case may be properly characterized as malicious as well, the Court has not had the opportunity to engage in sufficient inquiry of plaintiff's motivations in filing the instant action to make such a finding, *see id*., and therefore declines to do so. If Ms. Wright wishes to pursue attorney's fees and costs related to this action, she is advised to follow the procedures outlined in Fed. R. Civ. P. 54(d) and LCR 54.

---

[7] Pursuant to 28 U.S.C. § 1915(g), a prisoner may not proceed *in forma pauperis* in a civil action if he or she has, on three or more prior occasions, brought civil actions or appeals that were dismissed on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

REPORT AND RECOMMENDATION
PAGE - 24

CONCLUSION

Based on the foregoing, this Court recommends that all defendants' motions for summary judgment be granted, and that plaintiff's amended complaint and this action be dismissed with prejudice.  A proposed order accompanies this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21)** days of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motion calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 3, 2020**.

DATED this 10th day of March, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 25